**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISON**

| | | |
|---|---|---|
| PATRICIA MENDEZ, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08cv1216 |
| v. | ) | |
| | ) | Judge Shadur |
| SIEBERT GROUP 1, LLC-S.G. SERIES 4, | ) | Presiding |
| PHILLIP SIEBERT, as owner and in his individual | ) | |
| capacity, THOMAS ISCHKUM, KAREN ISCHKUM, | ) | |
| GSF MORTGAGE CORPORATION, MORTGAGE | ) | |
| ELECTRONIC REGISTRATION SYSTEMS, INC., | ) | |
| COUNTRYWIDE HOME LOANS, INC., and | ) | |
| UNKNOWN OCCUPANTS AND NONRECORD | ) | |
| CLAIMANTS, | ) | |
| Defendants. | | |

**DEFENDANT TOM ISCHKUM'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendant THOMAS ISCHKUM by and through his attorneys, Gomberg, Sharfman,

Gold and Ostler, P.C., respectfully responds and opposes Plaintiff Patricia Mendez's ("Plaintiff")

Motion for Temporary Restraining Order pursuant to Rule 65.  In support hereof, Defendant

states as follows:

**I.    Overview**

Plaintiff brings a motion for temporary restraining order in an effort to forestall the

forcible entry and detainer trial scheduled as a result of her failure to abide by the terms of an

Order of the Circuit Court of DuPage County.   Specifically, Ms. Mendez seeks relief from her

failure to comply with the Court Order that she pay the Ischkums for her continued use and

occupancy of the disputed property.  This court temporarily granted her relief on June 16, 2008.

Mr. Ischkum opposes any further injunction against proceeding with the forcible action against

Ms. Mendez.

II.    **Statement of Facts**

Most facts are not in dispute.  Ms Mendez took title to the property in question in 1993. Complaint ¶ 10.  Prior to any contact or communication with Mr. Ischkum or GSF Mortgage Corp. Ms. Mendez took out a first mortgage loan with TCF Bank and a line of credit with Avondale Federal.  These loans were paid off in 1999 by a $93,000 loan obtained by Ms. Mendez through the assistance of Tom Ischkum and GSF Mortgage.  Complaint ¶ 12.  Ms. Mendez then conveyed title in 2001 to herself and her boyfriend, Jeffrey Norman, and together they refinanced in 2001 and again in December, 2003.  Complaint ¶ 12 - 13 and Ischkum Declaration, ¶ 2 attached as Exh. 1.  Ms. Mendez in her complaint and other pleadings conveniently ignores Jeffrey Norman and any role he may have played in these earlier mortgage transactions.

By May 2004 Mr. Norman had left the picture, deeding his interest to Ms. Mendez and leaving her to fend for the  mortgage payments they had together been obligated to pay.   The Complaint alleges that Ms. Mendez struggled to make her mortgage payments until she became unemployed.  Complaint ¶ 14.  At this point the facts alleged in the Complaint are incomplete.

Ms. Mendez alleges that she contacted Tom Ischkum and that he told her he "would take care of it".  Complaint ¶ 14.  During this March 5, 2007 conversation Mr. Ischkum took her loan application and with her permission pulled her credit report.  However he discovered that all her credit scores were too low for her to get a new loan.  Ischkum Declaration ¶ 3.

Contrary to her allegation that "he would take care of it", Mr. Ischkum immediately contacted Ms. Mendez and told her that none of the banks would provide her financing and he could not help her.  Ischkum Declaration ¶ 4.  It was Ms. Mendez who asked if there were any other options. Ischkum Declaration ¶ 5.  Only then was she referred to Pat Cardoni at Home

2

Buyers Realty Corp. ("HBRC") because he was experienced in dealing with short sales with lenders and with other investors that may be able to help her.  Ischkum Declaration ¶ 5 and Cardoni Declaration ¶ 1 attached at Exh. 2.  Other than his introduction of Pat Cardoni, Tom Ischkum had no role in the financial decision made by Mrs. Mendez to enter into the sale-leaseback agreement.  Ischkum Declaration ¶ 10-13.

All the parties agree that after his referral to Pat Cardoni, Tom Ischkum  did not have any further contact with Ms. Mendez up to and including the closing.  The Complaint does not allege any continued contact with her.  There is simply no allegation that he took any further action to induce Ms. Mendez to participate in this transaction.

Ms. Mendez claims that the first time she met Pat Cardoni was when he made a visit to her home a few days after her call to Tom Ischkum Complaint ¶ 15.  However Pat Cardoni had multiple meetings with Plaintiff.  He  first met Ms. Mendez at the Home Buyers Realty Corporation offices to get understanding of her situation. Cardoni Declaration ¶ 3-6.   At this first meeting he counseled Mrs. Mendez to sell her home.  However she told Pat Cardoni that her house had been built by her father and that she would never sell.   Cardoni Declaration ¶ 4.  Pat Cardoni explained other options to Mrs. Mendez at this first meeting.  He spoke to her son to determine whether he could cure her existing loan default and maintain future loan payments. Cardoni Declaration ¶ 8.  Her son state that he could not cure his mother's default.  Cardoni Declaration ¶ 8.  Without the willingness to sell and without the ability to cure the current loan default they next discussed other options.  Cardoni Declaration ¶ 8.  These options included a sale-lease back of the property.  Pat Cardoni explained that Plaintiff could sell the home to an investor, remain in the home as a tenant,  receive funds to repair the house, pay off her current

bills and, over the next 18 months, improve her credit score to allow her repurchase of the home based on her restored credit.  Cardoni Declaration ¶ 5.

At this initial meeting Pat Cardoni counseled Mrs. Mendez that in order for the lease back option to succeed, this would mean that she would have to change completely the way she had conducted her affairs up to this point.  Ms. Mendez told Pat Cardoni, and her credit report confirmed, that she was behind on virtually every one of her debts.  Cardoni Declaration ¶ 6; Ischkum Declaration ¶ 3.  Ms. Mendez alleges that Defendants knowledge of her poor financial condition demonstrates an intent to swindle her out of her home.  Complaint ¶ 22.  However the knowledge of her existing financial condition combined with her adamant desire to continue to occupy the residence made the sale-leaseback her only viable option.  Ms. Mendez assured Pat Cardoni that this was an acceptable option because her son Jay and his girlfriend were willing to move in with her and help her pay the lease payments.  Cardoni Declaration ¶ 6.

Pat Cardoni had a second meeting Ms. Mendez at her home so that he could view the property, determine the need for home repairs, explain again the sale-leaseback proposal and determine the willingness of her son to help financially.  Cardoni Declaration ¶ 6, 7.  Also present with Plaintiff and her son at this meeting was Jay's girlfriend who also gave assurances regarding the financial help they would bring.  Cardoni Declaration ¶ 7.  They explained that they were paying $1000 /mo in rent currently and were willing to maintain that level of payment for the lease on the house.  Cardoni Declaration ¶ 7.  In addition Mrs. Mendez report that she was about to begin a waitressing job after months of unemployment.  Cardoni Declaration ¶ 20.

During this meeting and home inspection Pat Cardoni found the home to be in general disrepair including one major problem. There was a hole in the roof approximately four feet

4

wide.  The hole was covered with a tarp, but water had seeped down the interior walls and into

the basement.  This water damage and potential mold issue needed to be repaired because no

lender  would make her a loan unless the repairs were made.  Cardoni Declaration ¶ 9.   After the

home inspection Pat Cardoni met with Mrs. Mendez, Jay and his girlfriend to talk about what Pat

Mendez needed to do in order to get her credit restored (pay off all outstanding debts), her house

restored (fix the roof, repair the water damage and the bathroom), as well as what the cost to her

would be of doing the sale-leaseback option.  Cardoni Declaration ¶ 10, 13, 14.  Following this

discussion Patricia Mendez, Jay and his girlfriend all said they wanted to do what they could to

keep possession of the property and decided to do a lease back with repurchase option as quickly

as possible in order to get it done prior to an expected Lis Pendens filing so that it would not be

part of Pat's credit history.  Cardoni Declaration ¶ 11.  If a foreclosure had been filed it was Pat

Cardoni's belief that it could  mean a three year wait before Mrs. Mendez could restore her credit

rating to be eligible for an FHA loan or conventional lending.   Cardoni Declaration ¶ 11.  At this

meeting Pat Mendez and her son asked that Pat Cardoni to proceed immediately with the

documents for the sale-leaseback option.  Cardoni Declaration ¶ 11.  Pat Cardoni discussed with

them the dangers if they went into default and were not able to do the repurchase.  Cardoni

Declaration ¶ 32.

      No one was waiting in the wings to do this deal with Mrs. Mendez.  In order to

accomplish this sale/lease-back transaction Pat Cardoni had to solicit for investors.  Because of

the speed with which he believed it was necessary to consummate this transaction (in order to do

pay off the lender prior to any foreclosure) Pat Cardoni went to potential investors who had

immediate access to cash sufficient to pay off the Mendez mortgage loan and fund the cost of

repairs. Cardoni Declaration ¶ 15.  He contacted six different investors, none of whom were interested for the reasons stated in Cardoni Declaration ¶ 15.   Neither Siebert Group I, LLC nor Tom Ischkum were among the initial group of investors contacted by Pat Cardoni.  Cardoni Declaration ¶ 15.  Siebert Group 1 LLC ("Siebert") was willing to purchase the property outright, but not as a long term investor.  Cardoni Declaration ¶ 16.  When he was unable to locate a long term investor Pat Cardoni went back to Mrs. Mendez to see if she would sell outright.  Cardoni Declaration ¶ 16.  She said no. Cardoni Declaration ¶ 16.

At his point Pat Cardoni went back to Siebert to see if it would fund the purchase and then agree to be taken out by a long term investor sometime soon after the closing. Cardoni Declaration ¶ 16.   Siebert agreed under the conditions stated at Cardoni Declaration ¶ 16.

It was only at this point that the Ischkum's were asked to become the long term investors in this sale-leaseback transaction.  Cardoni Declaration ¶ 17; Ischkum Declaration ¶ 6, 7.

Pat Cardoni of Home Buyers Realty Corp. put together the documentation for this three way transaction.  The deal, as explained by Cardoni to Mrs. Mendez, was as follows: Siebert Group I, LLC would purchase 366 N. Central, Wood Dale, Illinois for $165,000.  All repairs to the home would be completed to make the home appropriate collateral for a loan.  Just as soon as the Ischkums could get financing, Siebert Group I, LLC would sell the home to Tom and Karen Ischkum for $173,250.  This reflected a 5% payment to Siebert.  A lease back with option was created between the Ischkums and Patricia Mendez for her repurchase of her home.  The terms of this agreement were discussed with and agreed to between Pat Cardoni, Patricia Mendez and her son Jay.  Cardoni Declaration ¶ 21.

There were several additional discussions between Patricia Mendez and Pat Cardoni

regarding the calculation of her repurchase price.  Cardoni Declaration ¶ 22 - 26.  Approximately

one week prior to closing the Ischkums and Patricia Mendez agreed on the final price for a

repurchase in the amount of $218,000.00.  Cardoni Declaration ¶ 25 - 26.  The calculation of the

repurchase price was explained to and approved by Mrs. Mendez prior to and at the closing.  The

documents signed at the closing reflect the amounts approved by her, the Ischkums and Siebert.

Cardoni Declaration ¶ 22 - 26.

   This transaction was not designed to fail as alleged by Plaintiff.  Patricia Mendez

provided assurances to Pat Cardoni that she would be in a position to maintain lease payments

and then consummate her repurchase option.  Pat Cardoni was told: 1) that Patricia Mendez had

been making close to $30,000 a year in her medical job; 2) that she was now looking for a

comparable job and was confident she would get it quickly; 3) in the meantime she had a

waitressing job lined up; 4) her son Jay was employed making $36,000 selling wheels and would

move back home to pay rent to his mother; and 5) Jay's girlfriend was also employed in an office

position making $30,000 and was also willing to move in and pay rent.   This meant that there

was a current ability to afford the future lease payments.  Cardoni Declaration ¶ 29.

   In his experience with similar situations and based upon these assurances Pat Cardoni

expected that Mrs. Mendez could not only afford the lease payment, but also at the end of her

lease she would be able to afford a mortgage payment of $1,800 which she would need to

accomplish the repurchase.  Cardoni Declaration ¶ 30.  The sale-leaseback transaction relieved

her of a defaulted first mortgage payment obligation in an amount that exceeded her new monthly

lease payment, paid off all her debts, and repaired the damage to her home.  If she remained debt

free, she alone or she and her son could afford a future loan sufficient to pay off the repurchase price of $218,000.  Cardoni Declaration ¶ 30.

The decision of Tom and Karen Ischkum to become the long term investors was made only because they believed that this transaction would succeed not because they hoped it would fail.  Ischkum Declaration ¶ 9.  Tom Ischkum  was assured by Pat Cardoni that Patricia Mendez had her son moving into the property with his girlfriend and they currently were paying $1,000 per month and with the 3 incomes they easily could make the lease payments and then at the end of the lease approval for a loan to repurchase the property.  Ischkum Declaration ¶ 9.

The purpose of this sale-leaseback transaction was to allow Mrs. Mendez a fresh start. Tom Ischkum believed that his purchase of the property would allow her to erase her default to her existing lender, pay all of her existing creditors and fix the many problems in the home. Ischkum Declaration ¶ 14.   Mrs. Mendez would be relieved of her obligation to pay $1,054.20 to Chase Home Finance and instead pay $1,001.60 in rent to Thomas Ischkum.[1]  Ischkum Declaration ¶ 14.  The rent obligation was made to mirror both the expected rent to be paid to her from her son and his girlfriend and equal to the mortgage payments the Ischkums took out to finance this transaction.  Ischkum Declaration ¶ 14.

In the balance of hardships, the monetary burden has been carried by the Ischkums alone. The essential nature of this transaction relieved Mrs. Mendez of her burden to make mortgage payments to Chase Home Finance and instead substituted those payments to the Ischkums.  It is

---

[1]  The actual rent payments are $1,557.15 per month to match the Ischkum loan payments. However in order to keep Ms. Mendez loan payments equivalent to the expected rent from her son and his girlfriend there was a "prepaid rent escrow" established at closing.  Money was drawn from this escrow each month to add meet the total rent due.

the Ischkums who now must make the mortgage payments or risk foreclosure and damage to their credit. Ms. Mendez freely admits that she made only a few payments under this lease arrangements and has made no payment for almost a year. Complaint ¶ 22; Ischkum Declaration ¶ 15.

To meet their financial burden the Ischkums had to increase the line of credit on their home just to keep up with their $1,557.00 mortgage payments on the property at 366 N. Central Ave., Wood Dale, Illinois. Ischkum Declaration ¶ 16. As a result of the lease default by Mrs. Mendez the Ischkums have paid over $18,000.00 in mortgage payments without any contribution by Mrs. Mendez. Ischkum Declaration ¶ 17. Mrs. Mendez has received funds to repair her property and now lives in the property rent free, having shifted the burden of mortgage payments onto the Ischkums. Ischkum Declaration ¶ 17.

In his declaration, Thomas Ischkum states that the default in the sale-leaseback transaction is soon to have a devastating impact on his personal financial situation. Ischkum Declaration ¶ 18-19, 21.

On April 3, 2008 the DuPage court ordered Ms. Mendez to pay use and occupancy payments equal to those she had paid to Chase Home Finance. The rationale used by the Court was that even if Ms. Mendez were to be successful in her claims, the result would be that the Defendants would have the status of an equitable mortgagee, entitled to payments equal to those of the lender paid off using Defendants proceeds. *Aames Capital Corporation v. Interstate Bank of Oak Forest*, 315 Ill. App.3d 700, 734 N.E.2d 493 (Ill. App. 2nd Dist. 2000). Mrs. Mendez has ignored the orders of the DuPage court to pay this use and occupancy.

9

### III.        Argument

A plaintiff who seeks a preliminary injunction must show that she has no adequate remedy at law and that she will suffer irreparable harm if the injunction is not granted. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).   Only if the party will suffer irreparable harm that cannot be fully rectified by the final judgment after trial can the party get a preliminary injunction. *Id.*   A party seeking to obtain a preliminary injunction must demonstrate: (1) some likelihood of success on the merits; (2) that it has no adequate remedy at law; and (3) it will suffer irreparable harm if the injunction is not granted. *Abbott Labs v. Mead Johnson & Co.,* 971 F. 2d 6, 11 (7th Cir. 1992).   "If these conditions are met, then the court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently." *Storck USA, L.P. v. Farley Candy Company*, 14 F. 3d 311, 314 (7th Cir. 1994).   "Finally, the court must consider the public interest (non-parties) in denying or granting the injunction.  (Citation omitted.)  The court then weighs all of these factors, 'sitting as would a chancellor in equity,' when it decides whether to grant the injunction.  (Citation omitted.)  This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Group, Inc.,* 237 F. 3d 891, 895-96 (7th Cir. 2001).

### A.  Plaintiff has not shown that she is likely to succeed on the merits.

In Plaintiff's complaint and her memorandum in support of temporary restraining order she spins a tale of being duped into a transaction that she did not understand and that she did not intend. Upon examination of the Ischkum and Cardoni declarations it is apparent that Plaintiff is not likely to succeed on the merits of her claim that she is the owner of the property free of any

10

claim by the defendants.  Indeed Plaintiff repeatedly requests relief which acknowledges that even if successful  her interest would be subject to a mortgage claim by the Ischkums.

In Pat Cardoni's Declaration attached to this Response, Mr. Cardoni explains in great detail the discussions and negotiations that led to the decision to enter into the sale and leaseback transaction.  The declaration painstakingly goes through all of the reasons and warnings given to Ms. Mendez. It was Ms. Mendez who insisted on a sale and leaseback transaction so that she could remain in her childhood home. She made promises to pay, gave assurances that this transaction would succeed, outlined her plan for success and insisted on a transaction that would leave her in possession of the house.

**B.   An adequate remedy at law exists for Plaintiff**

Plaintiff claims that she has no adequate remedy at law should the preliminary injunction be denied. This assertion is false because Plaintiff has an adequate remedy at law for each of her many counts.

Ms. Mendez admits that her sale-leaseback transaction relieved her of her mortgage debt and allowed her to repair the residence.   However she seeks to enjoin Mr. Ischkum from proceeding with his legal right be paid or to seek possession of the premises without offering to provide Mr. Ischkum with the protections he would get even if her claims turn out to be true.

The Circuit Court of DuPage County considered the impact of her claims when the eviction case was stayed pending resolution of this federal court proceeding.  On April 3, 2008 Ms. Mendez was ordered to pay use and occupancy as *quid pro quo* for the delay in proceeding with the eviction trial.  The amount of the use and occupancy payments were limited to the amount she had been paying to her mortgage lender.  No matter how sinister the conduct of the

Ischkums and other defendants are alleged to be, there is simply no dispute that together these defendants provided funds to relieve Ms. Mendez of her mortgage payment obligation. All of her claims in federal court will remain unaffected by requiring Ms. Mendez to comply with the payment of her use and occupancy. Her claims seek money damages, punitive damages, statutory damages and recognition of her status as a mortgagor. The intent of the Order for Use and Occupancy does not undermine any of those claims.

**C. The balance of harms weighs in Ischkum's favor.**

The grant of any injunctive relief restricting Mr. Ischkum from obtaining revenue from the property in order to pay the replacement lender creates a huge financial burden for Mr. Isckhum and his family. The harm to the Ischkums outweighs the harm Plaintiff. Mr. Ischkum continues to bear the sole responsibility for Ms. Mendez's living expenses. She has made no payments toward her own shelter for one calendar year. Mr. Ischkum has borne the burden alone and if he is unable to receive rental or use and occupancy payments from Ms. Mendez, he will succumb to this financial burden alone. If the forcible entry and detainer trial proceeds in DuPage, Ms. Mendez would retain her claims and be able to defend the eviction action with all of her available legal and equitable defenses. Indeed, Ms. Mendez could remedy the entire situation should she comply with Judge Wheaton's April 3, 2008 Order.

    i. <u>The status quo is not preserved by enjoining the forcible entry and detainer action</u>.

Another consideration to make in deciding whether a preliminary injunction should be granted is whether it preserves the status quo. *Roland Machinery Co.,* 749 F.2d 380 at 383. If a plaintiff seeks more than a return to the status quo, then the injunction is probably not appropriate. *Id.* The concept of status quo is ambiguous. *Id.* Ms. Mendez's temporary

12

restraining order and preliminary injunction obliterate the status quo. The Use and Occupancy

Order is intended to restore the status quo, i.e. to require Ms. Mendez to pay rent or use and

occupancy payments for her continued use and possession of the premises. Even before Mr.

Ischkum became Ms. Mendez's landlord, she was required to make a payment to Chase Home

Finance in order to remain in the premises. Through an injunction, Ms. Mendez seeks to turn the

status quo on its ear and require that Mr. Ischkum pay the mortgage and taxes and insurance for

the property that she claims as her family home all *while she pays nothing*.  Ischkum Dec. ¶ 15,

17. Mr. Ischkum indeed has been paying the mortgage, taxes, and insurance for this property and

Ms. Mendez has made no payments for over a year. Ischkum Dec. ¶ 15, 17.

     ii.   <u>The sliding scale approach does not favor Plaintiff</u>.

     The sliding scale approach as described in *Roland Machinery Corp.* does not favor a

preliminary injunction. The harm to Mr. Isckhum if Plaintiff is wrongfully granted the

preliminary injunction outweighs the harm that Ms. Mendez will endure should the preliminary

injunction be wrongfully denied.  In the context of the forcible trail, Ms. Mendez has all of her

legal and equitable defenses available to her and can properly defend herself through the able

assistance of her counsel.

     **D.**    **The public interest is harmed by an injunction in this context.**

     The long-standing concept that preliminary injunctive relief must not "disserve the public

interest" reflects the judicial concern whether "an order granting or denying a preliminary

injunction will have consequences beyond the immediate parties." *Cleveland Hair Clinic, Inc. v.

Puig*, 968 F. Supp. 1227, 1249 (N.D. Ill. 1996) quoting *Roland Machinery Corp.*, 749 F.2d at

388.  In this matter, the public interest will have a negative impact on both the freedom of

contract and the landlord-tenant relationship.

i.  The freedom of contract and obligation to perform under
    <u>freely formed contracts are negatively impacted by an injunction</u>.

The bedrock principle that parties are free to contract for any lawful purpose is infringed by a grant of a preliminary injunction. Ms. Mendez freely entered into a contract for the sale of her home and was repeatedly advised of her options. See *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353 (1937). She chose to enter into the contract of her own freedom of choice and accepted its benefits.

ii.  The sole remedy available to landlords where they have a
     <u>non-paying tenant is negated if an injunction is granted</u>.

A forcible entry and detainer action is statutory regime that it is in derogation of the common law.  In Illinois, such actions are governed by the procedures and requirements of the Forcible Entry and Detainer Act, 735 Ill. Comp. Stat. 5/9-101 *et seq*.  The only method for a landlord to regain possession of a property is to follow the procedures as outlined in the Act. 735 Ill. Comp. Stat. 5/9-101 *et seq*.   Where the landlord has a non-paying tenant, he must institute a forcible proceeding that follows both the spirit and the letter of the Act before he can regain possession of the property.  735 Ill. Comp. Stat. 5/9-101 *et seq*.  Mr. Ischkum is unable to otherwise dispossess the tenant of the property and is stuck paying the bills while a non-paying tenant remains in possession.  All the while, the landlord continues to make mortgage, tax and insurance payments.

The Illinois Supreme Court has analyzed a case involving a landlord-tenant relationship and the issues regarding enjoining a landlord from proceeding with a forcible entry and detainer action.  *Kanter & Eisenberg v. Madison Associates*, 116 Ill. 2d 506, 508 N.E.2d 1053 (Ill. 1987). The court found that "[i]n many cases a landlord's ability to meet mortgage or tax payments or operating expenses many depend on the collection of rent, and if the landlord is barred by court

14

order from either collecting the full amount or replacing the tenant, he could forfeit his own interest in the property or become liable to other tenants." *Id.* at 513.

Mr. Ischkum is now in that precise predicament where he is struggling to keep up with the mortgage and tax payments to keep a non-paying tenant in the property.  It is an unfair and unjust result.

**E.    A bond of sufficient security should be required to protect Mr. Ischkum's from the damages and costs he is certain to incur should a preliminary injunction issue.**

Under Rule 65(c), a restraining order or preliminary injunction shall not issue except if the applicant for such injunctive relief gives an appropriate bond to cover the payment of such costs and  damages to a party who is found to have been wrongfully enjoined or restrained from action.  The sum of the bond is to be decided by the court. Fed. R. Civ. P. 65(c). The bond is required for temporary restraining orders or for preliminary injunctions.

**F.    In the alternative, Mr. Ischkum seeks a trial on the merits.**

Under Rule 65(a)(2), Mr. Ischkum seeks that the trial in this matter be advanced so that a hearing on the merits of Ms. Mendez's claims for relief be a final determination of all parties rights and interest.  The expense and burden of supporting Ms. Mendez and providing her shelter free of charge has drastically affected Mr. Ischkum and the consolidation will lessen both the expense and burden.  A final trial on the merits will decide the issues and determine that either: (1)  Ms. Mendez has an equitable mortgage, in which case she will be required to make payments to her mortgagee, Mr. Ischkum; or (2) Ms. Mendez is a tenant in the property and she must make rental payments Mr. Ischkum.

## IV.    Conclusion

Wherefore, Thomas Ischkum, prays for the entry of an Order dissolving the Temporary Restraining Order of June 16, 2008 and denying a preliminary injunction and for such other and further relief as this Court may deem just.

Respectfully Submitted,
THOMAS ISCHKUM

Dated:    June 23, 2008

By:

_____/s/ Raymond J. Ostler_____
One of his attorneys

Raymond J. Ostler
Nazia J. Hasan
Gomberg, Sharfman, Gold & Ostler, P.C.
208 South LaSalle St., Suite 1200
Chicago, Illinois 60604
(312) 332-6194 phone
(312) 332-4083 fax

CERTIFICATE OF SERVICE

   I, Raymond J. Ostler, certify that, service of this document was accomplished pursuant to Rule 5(b)(2)(D) and Local Rule 5.9 through the District Court's electronic filing system ("ECF") which will send notice electronically to counsel registered to receive such notice on June 23, 2008.


                                        /s/ Raymond J. Ostler_____