IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICIA MENDEZ, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SIEBERT GROUP 1, LLC-S.G. SERIES 4, ) <br> PHILLIP SIEBERT, as owner and in his individual ) <br> capacity, THOMAS ISCHKUM, KAREN ISCHKUM, ) <br> GSF MORTGAGE CORPORATION, MORTGAGE ) <br> ELECTRONIC REGISTRATION SYSTEMS, INC., ) <br> COUNTRYWIDE HOME LOANS, INC., and ) <br> UNKNOWN OCCUPANTS AND NONRECORD ) <br> CLAIMANTS, ) <br> ) <br> Defendants. ) | Case No. 08 C 1216 <br> Judge Shadur <br> Presiding |

**SWORN DECLARATION OF THOMAS PATRICK CARDONI IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to 28 U.S.C. §1746, Thomas Patrick Cardoni submits the following Declaration in Opposition to Plaintiff's Motion for Temporary Restraining Order:

1.  At all times relevant to the matters in this Declaration I have been employed as a real estate agent employed by Home Buyers Realty, Inc. Located in Schaumburg, Illinois. A main part of my business was dealing with homeowners in distressed situations. In March, 2007 I had approximately 30-40 listings with 75% of those being with homeowners in a similar situation. To that end my practice included attempting to obtain short sales as well as negotiated settlements on liens and judgments as well as in some instances as a last option, a sale-lease back.

2.  In early March of 2007 I was contacted by Tom Ischkum of GSF Mortgage about a past customer of his named Patricia Mendez. Tom told me she had refinanced her home a few times

with him and was now unable to obtain refinancing. Tom asked if I would speak to her regarding whatever other options may exist.

3. I met Ms. Mendez at the Home Buyers Realty Corporation offices to get understanding of her situation. She stated that she had lost a job at a hospital, was unemployed but starting a job as a waitress in a week. Also she maintained that she was seeking a job in her field.

4. I counseled Mrs. Mendez to sell her home. My first and strongest appeal to any homeowner in her situation is to sell. Ms. Mendez was no different. I stated her best option was to let go and put the house on the market as she would have plenty of room to sell and walk away with money and the ability to get her life back in order. She told me that the house was built brick by brick by her father and that she could never sell. She wanted to keep the house.

5. I therefore explained other options to Mrs. Mendez at this first meeting. These options included a lease back with option. I explained that with equity in her home it could be used to create a contractual agreement where she could sell the home to an investor under terms acceptable to her and at closing immediately enter into a contract to repurchase the home on terms that would meet her lending ability after her credit was restored.

6. At this initial meeting I counseled Mrs. Mendez that in order for the lease back option to succeed, this would mean that she would have to change completely the way she had conducted her affairs up to this point. Ms. Mendez was being behind on virtually every one of her debts. After inquiring about her financial situation I told her that she would not be a very good investment risk as she had insufficient income to cover any type of repurchase agreement. However she assured me that this was not a problem as her son Jay and his girlfriend were willing to move in with her and help her save the house. At this point we agreed to meet at the home so that I could view the property and receive assurances from her son as well as his

girlfriend regarding the help Ms. Mendez believed they would bring to her situation.

7.     Two or three days later we met at Pat Mendez's home. Her son Jay as well as his girlfriend were now brought in the discussion regarding Ms. Mendez' situation and possible remedies. Once again I went through the option of the sale of the property and the alternative structure of possible sale-lease back scenario. My main focus at this time was to get an understanding of Jay's commitment as well as his girlfriend's commitment to Pat's problem. Jay stated that he wanted to ensure that his mother would not lose her house as he was sole heir to the house and that he and his girlfriend were going to move in and help pay for the home. They subsequently explained that they were paying $1000 /mo in rent currently and were willing to maintain that payment on the house.

8.     At this meeting at the home I explored the possibility of whether Jay and his girlfriend could catch Pat Mendez up on her delinquent mortgage payments. They said no but they would help with the future house payments.

9.     At this meeting I was also shown what problems we were facing with the house. The house was in general disrepair. Deferred maintenance issues had affected both the outside and the inside of the home. The biggest issue was the hole in the roof. This hole was approximately a four foot hole with a tarp over it in the walk up attic part of the home. The hole in the roof made this home non-lendable. Also the hole had led to water seepage down the wall and in to the basement on that part of the house. This caused mold as well as water damage in one of the rooms adjoining the kitchen as well as starting the house down a path of deteriorization.

10.    After the home inspection I sat down with Mrs. Mendez, her son Jay and Jay's girlfriend to talk about what Pat Mendez needed to do in order to get her credit restored (pay off all outstanding debts), her house restored (fix the roof as well as the mold and the bathroom), as

well as what she was going to pay in terms of her home's equity in order to get all this done.

11.     Following this discussion Patricia Mendez, Jay and his girlfriend all said they wanted to do what they could to keep possession of the property and decided to do a lease back with option and repurchase as quickly as possible in order to get it done prior to an expected Lis Pendens filing so that it would not be part of Pat's credit history. If a Lis Pendens is filed it could mean a three year wait before Mrs. Mendez could be readily eligible for an FHA loan or five years for conventional lending.  They asked that I proceed immediately in finding an investor willing to help. Patricia Mendez then signed a listing agreement.

12.     The Mendez sale/lease-back was a complex situation due to the property condition as it would require that any investor would have to either put 20% down and borrow the balance or pay cash at the closing in order to pay off the existing lender.  I immediately started to solicit investors for this sale/lease back property.

13.     Patricia Mendez had credit scores in the low to mid- 400's.  Her credit could be restored well enough for an FHA loan so long as there were no late payments over the next 12 months. FHA loans are heavily dependent upon a borrower's debt ratio.  Therefore the transaction was structured so that Patricia Mendez would be debt free after the closing because all of her outstanding debts would be paid and the property would be repaired.  In addition she would have her son and his girlfriend to pay rent sufficient to support her lease payments.

14.     Because an FHA lender would require installing a new roof, the bathroom repaired and that the wall with the mold be repaired we made sure that the closing proceeds would be used to make these repairs.  All of these repairs were done to help Mrs. Mendez be able to qualify for an FHA loan at the time her repurchase obligation came due.  FHA also allows for the seller to gift the money to the buyer so that they can qualify for the loan which means that Pat, Jay and his

girlfriend would have very little out of pocket expense for repurchase.

15. In order to accomplish this sale/lease-back transaction I had to find an investor. I contacted Peg Meadors, Aimee Wainwright, Robert Fields, Dr. Robert Euland and Jim Fleck. Each of these investors declined to participate for the reasons described below:

    A. I first offered this opportunity to Peg Meadors who is an active investor who likes these types of deals. Peg acquires properties with 20% down payment and the balance in a mortgage. Peg drove by the house did not like the fact that the home had no garage and also felt sales in the area were not strong enough to justify the risk.

    B. I next offered this deal to Aimee Wainwright who is also an active investor who likes lease back with options. Aimee has some lending in her background and did not like the deal due to Pat Mendez's prior payment history.

    C. I next offered this deal to Robert Fields a new investor who had just purchased a house through a short sale that I was involved with. He did not like the home or its location. His earlier transaction had been in the Downers Grove area for a much higher price point.

    D. I often would offer or pitch deals to people I knew as investors it was part of my business. I believe I mentioned Pat's situation to Dr. Robert Euland and Jim Fleck.

16. Faced with no offers and a potential Lis Pendens clock ticking I floated the idea by Phil Siebert of Siebert Group 1 LLC. Phil Siebert was against any repurchase and asked that I approach Mrs. Mendez to see if she would sell outright. I again asked Patricia Mendez if she would sell but she said no. I then went back to Phil Siebert and asked him if he would purchase

it now if I could get someone to quickly take him out of the property. This would take care of any pending problem with her current lender and still allow Mrs. Mendez to do the lease with option. Phil Siebert agreed as long as he could recoup 5% for the use of his equity line and Siebert Group I, LLC was protected by a sale to a long term investor because he did not want to be involved in a long term lease with option or get stuck if Patricia Mendez backed out of the agreement.

17.     After obtaining this conditional approval of Siebert Group I, LLC, I then asked Tom Ischkum to consider the deal as he could watch Pat's credit and make sure that she is taking the proper steps to get in a position to repurchase. Tom told me he would speak to his wife and think about it.

18.     Tom Ischkum came to me after discussions with his wife Karen and said they would be willing to do it since Tom felt he had a good relationship with Mrs. Mendez.

19.     Based upon the agreement of Siebert Group, LLC and Tom and Karen Ischkum I then told Patricia Mendez that we had a deal that could work. I told her who was involved and what the costs to her would be.

20.     The transaction gave Patricia Mendez debt relief, necessary repairs to the home, some cash in hand as well as a payment equal to her son's current rent payment in the $1000 range. This would give her time to repair her credit, find a job (she was about to start waitressing at the time of the deal). Jay Mendez was selling wheels at a local outlet and also needed time for some credit repair.

21.     The deal would be as follows: Siebert Group I, LLC would purchase 366 N. Central, Wood Dale, Illinois for $165,000. All repairs to the home would be completed to make the home appropriate collateral for a loan. Just as soon as the Ischkum's could get financing, Siebert

Group I, LLC would sell the home to Tom and Karen Ischkum for $173,250. This reflects the 5% for use of the Siebert equity line. A lease back with option was created between the Ischkum's and Pat Mendez for her repurchase of her home. This was made clear in my conversations with Pat and Jay.

22. Pat Mendez and I agreed that her repurchase price would be calculated based upon the price of the Ischkum's purchase as it was his agreement to be a long term investor that allowed the transaction to happen. My initial discussion with Mrs. Mendez was that her repurchase price could be as low as $205,000. This was based on a simple calculation of $165,000 + 40,000 = $205,000.

23. I next reviewed these calculations with Tom Ischkum. The numbers for the repurchase would have looked like this: repurchase price of $205,000 minus 6% FHA gift of $12,300 = $192,700 to Tom and Karen. Subtracting closing costs and tax credits of 3% and the Ischkum's would be left with $186,919. $186,919 - $173,250 = $13,669 profit after 18 months for Tom and his wife. This was quite low for the risk involved and therefore not accepted by Tom and Karen Ischkum.

24. I informed Pat Mendez that the Ischkums had rejected the repurchase price of $205,000.

25. Approximately one week prior to closing the parties agreed on the final price for a repurchase in the amount of $218,000.00. I made the following calculation for this transaction keeping the $205,000 as the basis then put the closing gift on top: $218,000 - 6% gift of $13,080=$204,920 basis to Tom and Karen. Minus 3% closing cost and tax credits = $198,773. This results in a projected gross return to Ischkums as follows: $198,773 - $173,250= $25,523 to the Ischkum's. This calculation does not reflect the Ischkum's original loan costs nor do they reflect taxes due for capital gain.

26. I presented these numbers to both Tom Ischkum and to Pat Mendez separately at least one week prior to closing. Both parties agreed and I drew up contracts for both purchases and sent the terms of the deal to the attorney John Clery. Pat Mendez was fully informed by me about the exact nature of these transactions, the costs involved and the way in which her repurchase amount had been calculated at least one week prior to the closing.

27. Let me state unequivocally that neither Tom and Karen Ischkum nor Phil Siebert and Siebert Group I, LLC were involved in any way in the formulation or the creation or the pricing of this agreement.

28. If there was a violation of any Illinois statute it was the result of my mistake in understanding the letter of the law. I thought the law was designed to stop non-licensed individuals from preying on people by creating situations where a homeowner signs their house away to enter in to a contract that they could never perform. This was not supposed to be the case here.

29. It was expected that Patricia Mendez would be able to make her lease payments easily with the help of her son and his girlfriend. Pat Mendez's credit situation was known. She had been making close to $30,000 a year in her medical job, was now looking for a comparable job and was confident she would get a medical job quickly. Moreover her son was employed making $36,000 selling wheels. Her son's girlfriend was also employed in an office position making $30,000. This meant that there was the current capability to afford not only $1,000 a month in rent.

30. Not only was it expected that Mrs. Mendez would afford the lease payment, but also the monthly mortgage payment of $1,800 which she would need when the repurchase would happen in 18 months on an FHA loan at current market rates. In fact with all her debts paid off, if she

remained debt free, she and her son could afford a payment of over $2000 per month. This was my solution to a very complex financial situation. All parties in agreement, we moved towards closing.

31. I have been on the periphery of this suit all along. I have never been contacted by the attorney for Pat Mendez. This seems strange as I was the one representing her. Tom Ischkum asked me for my statement which I now provide. This deal was set up under the understanding that both parties would perform to the terms of the agreement. The only consideration here was that Pat, Jay and his girlfriend make their payments, stay employed and they could close within the 18 month period specified in the agreement. I have no idea where this got off the tracks as my only other contact was with Jay who came in twice asking for more money out of the deal to pay off some of his debts. He stated in hindsight that they did not ask for enough money to clear up all of his debts as well. We did however on line 1319 of the 3/16/2007 settlement date pay out of Pat's funds money for credit repair for Jay as well. This was done to ensure that Jay would also be lendable.

32. I remember one of the questions upon our first meeting being what would happen if they could not complete the terms of the deal. I told them that these deals are agreements that can be modified as long as both parties agree. I have been told that there have been offers to get the property sold and split the proceeds, offers to amend agreement to lower purchase price to reduce monthly payments as well as help with Pat's relocation all for naught. It seems that this all comes down to Patricia Mendez not accepting the fact that she can no longer afford this house no matter who holds the note.

33. Every intention of everyone involved from myself to Phil to Tom and his wife were that Patricia Mendez have a chance and be able to keep her fathers home. This agreement was made

in good faith by all parties.

34.     The issue of value has also been raised. This home and this agreement were entered in to with no appraisal on the property as true value had no bearing on the price. Pat was not selling her home to buy it back at market value. She was using her equity to fix a long term problem not only with her house but with her own and her son's credit.

I declare under the penalty of perjury that the
foregoing is true and correct. Executed this 20th day
of June, 2008 at Chicago, Illinois.

_____
Thomas Patrick Cardoni