IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICIA MENDEZ, )<br>)<br>　　Plaintiff, )<br>)<br>v. )<br>)<br>SIEBERT GROUP 1, LLC-S.G. SERIES 4, et al. )<br>)<br>　　Defendants. ) | Case No. 08 CV 1216<br>Judge Shadur<br>Presiding |

### PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiff, Patricia Mendez, by her attorneys, Prairie State Legal Services, Inc., in reply to Defendant Thomas Ischkum's Response in Opposition to Plaintiff's Motion for a Temporary Restraining Order, states as follows:

**I. Plaintiff's likelihood of success**

When deciding whether to issue a temporary restraining order or preliminary injunction, a court must consider the possible irreparable harm to the affected parties. Roland Machinery Company v. Dresser Industries, Inc., 749 F.2d 380, 387 (7th Cir. 1984). However, the court's analysis of the movant's likelihood of success must inform that decision. Roland 749 F.2d at 387. The more likely the plaintiff is to win, the less the plaintiff has to rely on the balancing of harms analysis. Id. In this case, even if Mr. Ischkum will suffer some harm if the preliminary injunction is granted, Ms. Mendez's likelihood of success is so great that it outweighs his harm.

1

Ms. Mendez disputes a number of the claims made by Mr. Ischkum and Mr. Cardoni in their declarations and particularly that she was told or knew that Mr. Ischkum was going to own her house. Nevertheless, despite these alleged facts, Ms. Mendez is still entitled to relief under state and federal law.

**A. Ms. Mendez can show violations of the Illinois Mortgage Rescue Fraud Act.**

While some of the facts surrounding the transaction are in dispute, no one is disputing the financial aspects of the transaction as reflected in the HUD-1 statement and Option to Purchase. See Exhibits A and B. In fact, in his declaration, Pat Cardoni sets out his calculations to reach the repurchase price in the Option to Purchase. Cardoni declaration ¶¶ 23-25. He indicates the calculations and final price were based on the potential financial gain for the Ischkums. However, the Illinois Mortagage Rescue Fraud Act (IMRFA) contains a strict requirement for distressed property purchasers regarding the sale and repurchase prices.

Ms. Mendez's home, at the time of the transaction, was a "distressed property" pursuant to the IMRFA because she was more than 90 days delinquent in her mortgage secured by the house. 765 ILCS 940/5. Siebert Group LLC, Thomas Ischkum and Karen Ischkum were distressed property purchasers, as the statutory definition includes "any person who acquires an interest in fee in a distressed property while allowing the owner to possess, occupy or retain any present or future interest in fee in the property, or any person who participates in a joint venture or joint enterprise involving a distressed property conveyance. . ." 765 ILCS 940/5. The law imposes requirements on distressed property purchasers at the time of the transaction to ensure that the transaction is fair to the distressed property owner. A distressed property purchaser must either ensure that the owner received consideration equal to at least 82% of the property's fair

2

market value or extinguish all liens on property and establish a repurchase price not to exceed 125% of the purchaser's cost to purchase the property. 765 ILCS 940/50(b)(2).

Siebert Group paid $165,000 for Ms. Mendez's property on March 16, 2007. The price included a $9,900 real estate commission for Mr. Cardoni, as well as a "document preparation fee" to Siebert Group's attorney, and other fees. The consideration Ms. Mendez actually received was approximately $140,000. That is 56% of the fair market value of the home ($250,000) as appraised on March 25, 2007 by Kevin Mende, an appraiser licensed by the State of Illinois. See Exhibit C. An appraisal by a person licensed by a state agency creates a rebuttable presumption of the fair market value of the house. 765 ILCS 940/50(c). Additionally, defendants had information that showed comparable sales in the area of the home averaged $285,000. See Exhibit D. Even assuming Ms. Mendez received the full $165,000, that only equals 66% of the fair market value. Defendants did not ensure that Ms. Mendez received consideration of 82% of the FMV.

Nor did defendants establish a repurchase price within the statutory limit. Although defendants did extinguish all outstanding liens on the property, the repurchase price exceeded the statutory ceiling of 125% of the purchaser's cost. 765 ILCS 940/50(b)(2). As Mr. Cardoni states in his declaration, the repurchase price was set at $218,000 to ensure that the Ischkums would have a sufficient profit margin. Cardoni declaration ¶ 25. However, that is 132% of Siebert Group's cost to purchase the property. Again, the law places these requirements on the property purchasers. Defendants cannot escape liability by blaming Mr. Cardoni.

The law further requires that distressed property purchasers ensure that the transaction is one that is affordable to the distressed property owner. The purchaser must verify and demonstrate that the owner can make monthly payments and has a reasonable ability to pay to

3

repurchase the property. 765 ILCS 940/50(b)(1). An evaluation of "reasonable ability to pay" includes an analysis of the fair market value, debt to income ratio, and the owner's payment history. 765 ILCS 940/50(e). Furthermore, there is a rebuttable presumption that the purchaser did not verify reasonable payment ability if he did not obtain documents of assets, liabilities and income, other than a statement from the owner. 765 ILCS 940/50(e).

In this case, it is clear the purchasers failed to verify Ms. Mendez's ability to repay. Mr. Cardoni's statements indicate that he relied solely on Ms. Mendez's and her son's statements to him regarding her employment, her son's employment and her son's ability to help pay rent. Cardoni declaration ¶¶ 3, 6 & 7. Although Mr. Ischkum states he requested her credit report, it showed that Ms. Mendez had low credit scores and was not a viable candidate for a loan. Ischkum declaration ¶ 3. According to Mr. Cardoni, he relied primarily on Ms. Mendez's statements. He failed to verify her ability to make the monthly payments or repurchase the property. Mr. Ischkum admits he relied on the statements from Mr. Cardoni and/or Mr. Siebert regarding Ms. Mendez's financial situation. Ischkum declaration ¶ 9. This violation of the IMRFA is the reason Mr. Ischkum is in the position he is in today, with Ms. Mendez contesting the transaction and unable to pay him the required monthly payments.

While defendant Ischkum seeks to distance himself from the transaction and blame Mr. Cardoni, who is not a party in this action, the law places these requirements on the distressed property purchasers. Mr. Ischkum's and Mr. Cardoni's statements make clear that at the time of the transaction, Mr. Ischkum was the intended ultimate purchaser. Therefore, he had specific obligations under the Illinois Mortgage Rescue Fraud Act, which he failed to meet.

There are numerous other violations of the IMRFA that Ms. Mendez can show. The IMRFA dictates the contents of the conveyance contract, including a notice regarding a right to

cancel the transaction. 765 ILCS 940/25 through 940/40. The one page Option to Purchase does not meet the requirements for a conveyance contract, and Ms. Mendez was never notified of her right to cancel. Furthermore, the purchasers were not permitted to execute or record the deed until Ms. Mendez's time to cancel had passed. 765 ILCS 940/50(b)(6). In fact, the deed and the Option to Purchase were executed on the same day. In addition, the contract must include a notice informing the homeowner "As part of this transaction, you are giving up title to your home." 765 ILCS 940/30(8). The Option to Purchase does not include that language. These violations of the IMRFA constitute unlawful practices under the Illinois Consumer Fraud and Deceptive Business Practices Act. 765 ILCS 940/55(a). Remedies under the Consumer Fraud Act include actual and punitive damages, equitable relief, and costs. 815 ILCS 505/10a.

**B. Ms. Mendez can prove the transaction was an equitable mortgage.**

Ms. Mendez has a great likelihood of success on her cause of action for an equitable mortgage. In fact, the statements submitted by Mr. Cardoni and Mr. Ischkum support her claim that the transaction did not constitute an outright sale, but an equitable mortgage.

Under Illinois law, not every deed conveys title. 765 ILCS 905/5. There are several factors to consider when deciding whether a transaction constituted an equitable mortgage and not a transfer of title, including, but not limited to: prior unsuccessful attempts for loans, the existence of a debt, the close relationship of the parties, the circumstances surrounding the transaction, the disparity of the situations of the parties, the inadequacy of consideration, and an agreement to repurchase. McGill v. Biggs, 105 Ill.App.3d. 706, 708 (3rd Dist. 1982). Several of these factors are present in this case, including the relationship between Ms. Mendez and Mr. Ischkum (her trusted mortgage broker), the fact that she contacted him to refinance her mortgage as she had done in the past, the fact that the house was purchased for $165,000, but its fair

5

market value was $250,000, and the existence of an option to repurchase that gave Ms. Mendez the right to buy back the house.

Mr. Cardoni's and Mr. Ischkum's statements support her claim.  Mr. Cardoni and Mr. Ischkum claim the intent of the transaction was to allow Ms. Mendez to repair her credit and get herself in a financial situation in which she could keep the house.  Cardoni declaration ¶ 13, Ischkum declaration ¶ 9.  They claim that they intended that she would qualify for an FHA loan to repurchase the property, and that the Ischkums would be "gifting" her some money for the repurchase.  Cardoni declaration ¶¶ 13 and 14.  The transaction was, as defendants and Mr. Cardoni describe it, a short-term loan designed to solve Ms. Mendez's immediate financial problem.  The execution of the deed was not meant to be a transfer of title, but merely security for the financial assistance they were providing.

Furthermore, the circumstances surrounding the transaction, including several cited by Mr. Ischkum and Mr. Cardoni, support that the transaction was in fact an equitable mortgage.  Ms. Mendez had prior unsuccessful attempts at loans, as Mr. Ischkum states that Ms. Mendez sought to refinance with Chase but was unable to, and that he told her that no banks would provide her with financing.  Ischkum declaration, ¶ 4.  Mr. Ishckum also acknowledges that he had assisted Ms. Mendez with refinancings in the past and that Ms. Mendez contacted him prior to this transaction seeking a loan.  Ischkum declaration, ¶ 2.  Mr. Cardoni states that Mr. Ischkum was willing to enter into the transaction with Ms. Mendez because of his "good relationship" with her.  Cardoni declaration, ¶ 18.  All parties agree that Ms. Mendez did not want or plan to sell her house.  Defendant's response page 3, Cardoni declaration ¶ 4.

Ms. Mendez can show that the 2007 transaction was an equitable mortgage and that she remains the title holder.  As the transaction was an equitable mortgage, Ms. Mendez was entitled

6

to receive certain notices and disclosures pursuant to federal lending laws and regulations. Defendants violated the Truth in Lending Act (TILA) and the Home Ownership and Equity Protection Amendment to TILA (HOEPA) when they did not provide these notices or disclosures. She is therefore entitled to statutory damages and a declaration that she is the rightful title holder.

## II. Mr. Ischkum's harm

Plaintiff disputes the harm Mr. Ischkum will suffer if he cannot presently seek to evict Ms. Mendez. Ms. Mendez did make her monthly payments beginning in March through July 2007. At the time Mr. Ischkum bought the property from Siebert Group, he received approximately $10,000 in prepaid rent from the funds paid to Siebert Group at the closing. Therefore, Ms. Mendez has paid him over $14,000. Furthermore, it appears that Mr. Ischkum's mortgage obligation is not $1557.00 as he stated (Ischkum dec. ¶ 16), but $1199.65. See mortgage statements, Exhibit E. Additionally, he currently holds the deed to the house, which he purchased for far less than fair market value. He stands to gain significantly from depriving Ms. Mendez of at least $100,000 in equity in the house.

Mr. Cardoni's and Mr. Ischkum's statements make clear that this was an investment opportunity for Mr. and Mrs. Ischkum, and designed to ensure they would receive a sizable profit. If the transaction was successful, they would profit when they sold the house to Ms. Mendez, as the interest rate of their loan to her was 32.9%. If the transaction failed, they would profit by evicting Ms. Mendez and re-renting or selling the house. Mr. Cardoni and Mr. Ischkum are both employees of companies owned by Phillip Siebert. All three men entered into this transaction for profit. Mr. Cardoni received $9,900 in realtor's fees, Siebert Group realized an

immediate 5% profit, and Mr. Ischkum purchased the house for far less than fair market value. While Mr. Ischkum attempts to portray himself as a generous benefactor, he is a businessman and was looking to make a profit.

As shown above, errors, omissions and miscalculations by Siebert Group and Mr. Ischkum resulted in the transaction being riskier than they anticipated. Mr. Ischkum is suffering the effects of this now. Although Ms. Mendez is unable to make her monthly payments, that does not change the essential nature of the transaction or the violations of the law. Ms. Mendez has a right to challenge the legality of the transaction now, and allowing Mr. Ischkum to evict her while her lawsuit is pending seriously compromises the relief she can obtain through this action. Ms. Mendez's likelihood of success is so great, and her harm irreparable and severe, it outweighs the harm Mr. Ischkum is suffering as a result of his bad investment.

**III. Ms. Mendez will suffer irreparable harm if Mr. Ischkum is permitted to proceed with the eviction action.**

If Mr. Ischkum proceeds with the eviction action, there is a great risk that Ms. Mendez will not be permitted to present a complete defense and will therefore be evicted. The lease agreement that forms the basis of his eviction action is at the heart of the controversy in this case, the nature and the legality of the sale-leaseback transaction. However, a forcible entry and detainer action is a summary proceeding in which a serious contest regarding title and the resulting right to possession cannot be fully tried. See Urbach v. Green, 15 Ill. App.2d 186, 188 (1st Dist. 1957). In this action, Ms. Mendez is contesting Mr. Ischkum's claim to title and contesting the validity of the sale -leaseback transaction. Defendants chose to remove those issues, which are critical to the forcible entry and detainer case, to federal court. Furthermore,

8

due to the summary nature of a forcible entry and detainer action, Ms. Mendez cannot fully litigate those issues in the state court eviction action, even as a defense to the eviction. Ms. Mendez must litigate those issues in federal court.

Moreover, a court in a forcible entry and detainer action cannot make a decision regarding title. Urbach v. Green, 15 Ill.App.2d 186 at 188-189. Therefore, Ms. Mendez will not be able to prevail in the eviction action by proving that she is the rightful title holder. This puts the forcible court in the untenable position of being asked to rule on the issue of possession without being able to give Ms. Mendez the relief to which she is entitled. If Ms. Mendez cannot successfully defend the forcible entry and detainer action, she faces homelessness, an irreparable harm that cannot be rectified by a judgment at the conclusion of this case. Enjoining Mr. Ischkum from prosecuting the forcible entry and detainer action is necessary to protect this Court's jurisdiction over the house and the issue of title.

Therefore, Ms. Mendez respectfully requests that this Court enjoin Mr. Ischkum from prosecuting a forcible entry and detainer action in state court.

Respectfully submitted,

/s/ Elizabeth Newkirk Jahoda
One of the attorneys for Patricia Mendez

Prairie State Legal Services
Elizabeth Newkirk Jahoda (#6283149)
Ana Collazo
Eliot Abarbanel
350 S. Schmale Rd., Suite 150
Carol Stream, IL 60188
(630) 690-2130

9